1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4

ZOLTAN STEINER, *et al.*,                                    No.  C 07-04486 SBA

5                            Plaintiff,                       **ORDER**

6          v.                                                [Docket No. 38]

7   APPLE COMPUTER, INC., *et al.*,

8                            Defendant.
    _____

9

10                          **REQUEST BEFORE THE COURT**

11          Before the Court is defendant AT&T Mobility, LLC's Motion to Compel Arbitration and to

12  Dismiss Claims Pursuant to the Federal Arbitration Act (the "Motion") [Docket No. 38]. Defendant

13  AT&T Mobility, LLC ("AT&T"), under the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et*

14  *seq.*, seeks to compel plaintiffs, Zoltan and Ynez Stiener to individually arbitrate their disputes,

15  regarding allegedly hidden and substantial battery-changing and related charges associated with

16  using their iPhones, under the Arbitration Agreement of a Terms of Service agreement between the

17  parties, while the Stieners seek to resolve the issue by class action.

18          Under Federal Rule of Civil Procedure 78(b), the Court find the Motion appropriate for

19  disposition without a hearing.  In doing so, the Court is bound by the Ninth Circuit's holding in

20  *Shroyer v. New Cingular Wireless Services, Inc.*, 498 F.3d 976 (9th Cir. 2007), finding

21  unconscionable a prior version of an AT&T class arbitration waiver.  Although AT&T has attempted

22  to modify the class arbitration wavier before the Court, to comply with the Ninth Circuit's holding in

23  *Shroyer*, it has failed to do so.  The Court thus finds the class arbitration waiver unconscionable, and

24  thus unenforceable.  As the waiver cannot be severed from AT&T's entire Arbitration Agreement, it

25  too must fail.  Lastly, under *Shroyer*, the Court finds the FAA does not preempt invalidating the

26  class arbitration wavier on this ground.  AT&T's motion to compel arbitration is thus DENIED.

27  ///

28  ///

**BACKGROUND**

**I.      The Stieners purchase two iPhones.**

Plaintiffs, the Stieners, are California residents.  Docket No. 1 ¶ 3 (Compl.).  On June 29, 2007, they purchased two iPhones at a San Francisco store, for $599 each, plus tax.  *Id.* ¶ 29; *see also* Docket No. 42  ¶ 6 (Decl. of Neal S. Berinhout in Supp. of the Mot. ("Berinhout Decl.")).  An iPhone "combines three amazing products—a mobile phone, a widescreen iPod and a breakthrough Internet device—into one small, lightweight, handheld device with desktop-class email, web browsing, searching and Google Maps."  Docket No. 39, Ex. "4" at 1, col. 1, para. 1 ("AT&T Plans for iPhone" pamphlet).

Defendant Apple Computer, Inc. ("Apple") apparently manufactures the iPhone. Docket No. 39, Ex. "2" at 1, para. last ("iPhone is a trademark of Apple Inc.") ("A few things you should know about purchasing and activating an iPhone" sheet (the "Fact Sheet")).  Allegedly, Apple began selling iPhones on June 29, 2007 for $499 for a four GB[1] model and $599 for an eight GB model.  Compl. ¶ 22.  Apple allegedly sold 270,000 phones in the first 30 hours of release, passing the 500,000 mark within a week.  *Id.* ¶ 23.  Apple also sells iPhones through AT&T's stores. *Id.* ¶ 24.

**II.      Activation and the Terms of Service**

AT&T and Apple "have an exclusive relationship" regarding the iPhone.  *Id.*; Fact Sheet at 1, para. 1.  As a result, to use wireless service on their iPhones, all users, including the Stieners, must activate them online with AT&T, through an Apple iTunes web site.  *See id.*, para. 2; *see* Berinhout Decl. ¶ 9.  In the Stieners' case, as a condition of using their phones, they were forced to purchase a two-year service plan from AT&T.  Compl. ¶ 29.

As part of the activation process, they had to click on a box next to the statement, "I have read and agree to the AT&T Service Agreement."  Berinhout Decl. ¶ 9.  The text of the agreement, including its terms of service, is displayed in a "scrolling" text box immediately above this

---

[1]      "GB" stands for "gigabyte."  The prefix "giga" means "one billion," and the suffix "byte" means "one data character," such as one letter, number, or symbol.  A four GB phone presumably holds four billion pieces of data, i.e., four billion letters, numbers, and/or symbols.

statement. Docket No. 39, Ex. "4" at 7 ("Consumer iTunes Activation Process" web p. images). The first sentence displayed in the scrolling text box, advised the Stieners by checking the check box below, they would be "bound" to "the Terms of Service, including the binding arbitration clause." *Id.* The Terms of Service were also available on AT&T's web site and in a booklet kept at the store where the Stieners bought their iPhones. Berinhout Decl. ¶ 8. In addition, AT&T mailed the Stieners a Terms of Service booklet after they activated their iPhones. *Id.* ¶ 10.

### III.    The Binding Arbitration Agreement

The Terms of Service contain an Arbitration Agreement (the "Arbitration Agreement") consisting of seven paragraphs.

### A.    The First Paragraph:  Scope

The first paragraph states the Arbitration Agreement "is intended to be broadly interpreted." Docket No. 39, Ex. "3" at 12 ¶ (1) (Terms of Svc. ("TOS") booklet). It includes but is not limited to claims arising in tort, contract, statute, or other legal theory, arising before the AT&T Services Agreement took effect, or which are then currently the subject of a class-action suit of which the consumer is not a member, or which arise after this agreement terminates. *Id.* It does not bar a consumer, however, from seeking relief in small claims court. *Id.* It specifies, in bold typeface, however, *"by entering this Agreement, you and AT&T are each waiving the right to trial by jury or to participate in a class action." Id.* It purports to be governed by the Federal Arbitration Act. *Id.*

### B.    The Second Paragraph:  Pre-arbitration Dispute Resolution

The Arbitration Agreement's second paragraph says a person wishing to arbitrate must first send a written notice to AT&T at a specific address in Atlanta, Georgia. *Id.* ¶ (2). If the dispute is unresolved 30 days after AT&T receives the notice, the person may seek arbitration with the American Arbitration Association ("AAA"). *Id.* at 13 ¶ (2).

### C.    The Third Paragraph:  Arbitration Procedures

The Arbitration Agreement's third paragraph says once the person begins arbitration, they may pay the filing fee, and AT&T will reimburse them for it, apparently $125 for disputes under $10,000; or, they may seek a pauper's wavier from AT&T, which will then pay it. *Id.* at 13 ¶ (3). Unless otherwise agreed, arbitration occurs in the county containing the person's billing address. *Id.*

Claims for $10,000 or less may be handled by written filings, telephonic hearing, or in-person hearing, at the person's choice.  *Id.*  Hearings for claims over $10,000 will be handled under the AAA rules, unspecified in the TOS booklet.  *Id.*  AT&T pays for all filing, administration, and arbitrator fees, unless the arbitrator finds the claim was frivolous under Federal Rule of Civil Procedure 11(b), in which case fees will be paid under the AAA rules, and the person will reimburse AT&T for any payments made which are the person's responsibility under these rules.  *Id.*

### D.     The Fourth and Fifth Paragraphs:  The Premium and the Attorney Premium

The fourth and fifth paragraphs address costs, fees, and damages:  If a person prevails on the merits at arbitration, and receives an award:  (1) equal to or less than the greater of (a) $5,000; or (b) the maximum jurisdictional dollar amount for small claims actions in the county containing the person's billing address;[2] and (2) greater than AT&T's last written offer prior to selecting an arbitrator; then AT&T will pay the greater of (1) or (2) instead of the award (AT&T calls this "the Premium"), and pay the person's attorney *double* their fees and reimburse them for reasonable costs (AT&T calls this "the Attorney Premium").[3]  *Id.* at 14 ¶ (4).

AT&T will also pay these premiums, if it fails to make a written offer prior to the selection of an arbitrator, and the person prevails and receives *any* relief.  *Id.*  In addition, the person may also seek any attorney's fees available under the applicable law, but only to the extent they exceed the Attorney Premium.  *Id.* at 15 ¶ (5).  Lastly, AT&T agrees not seek any costs or attorney's fees.  *Id.*

### E.     The Sixth Paragraph:  The Class Arbitration Waiver and Severance

The sixth paragraph reiterates in boldface all-capital typeface, "YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY

///

///

---

[2]     In California, small claims actions for natural persons are capped at $7,500 in damages.  Cal. Code Civ. Proc. § 116.221.

[3]     AT&T does not use leading capitals for "premium" or "attorney premium," but the Court does for clarity.

4

PURPORTED CLASS OR REPRESENTATIVE PROCEEDING." *Id.* at 15 ¶ (6). It also bars class arbitration. *Id.* And, it states, "If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void."[4] *Id.*

The Arbitration Agreement is silent regarding the confidentiality of any proceedings or awards and whether or not punitive damages are available. *See id.* at 12-15; Mot. at 4, paras. 5-6.

**IV.     The Stieners sue over the iPhone battery fees.**

On August 29, 2007, the Stieners filed suit in this Court against AT&T and Apple, alleging the iPhone has a battery inside which cannot be removed by a consumer, but which must be replaced after approximately 300 charges, i.e., about once a year or less. Compl. ¶¶ 25-26. To change the battery, Apple allegedly charges $79.00, plus $6.95 shipping and handling. *Id.* ¶ 27. Apple also allegedly charges $29.00 for the use of an "AppleCare Service Phone" while the battery is being replaced. *Id.* ¶ 28. The Stieners claim they were not informed at the time of purchase of the costs and procedures of replacing the battery. *Id.* ¶ 30. Allegedly, neither the box the iPhone was sold in nor the written information within explained the costs and procedures required to change the iPhone battery. *Id.* Further, the Stieners allege neither Apple nor AT&T disclosed any of this information to consumers in the months of promotion leading up to the initial sale date nor at the time of sale. *Id.* ¶ 31.

In their complaint, the Stieners seek to certify a class of all iPhone consumers. *Id.* ¶¶ 32-44. They claim breach of contract, violation of the implied warranty of merchantability, fraudulent concealment, and unfair competition under section 17200 *et seq.* of the California Business and Professions Code. *Id.* ¶¶ 45-59. They seek an accounting, consequential and direct damages, restitution, and fees and costs. *Id.* at 9.

**V.     AT&T's Motion and the Stieners' Opposition**

On November 21, 2007, AT&T filed the Motion, under the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1, *et seq.*, seeking to compel the Stieners to arbitrate under the Arbitration

///

---

[4]     The seventh paragraph merely addresses how AT&T may amend the Arbitration Agreement.

Agreement.[5]  *See* Mot. at 2; Mem. at 1:3-5.  In its Memorandum of Points and Authorities, AT&T correctly anticipates:

> The Stieners will likely oppose this motion by arguing that, because their arbitration agreement requires the resolution of disputes on an individual basis, they are unconscionable under the California Supreme Court's decision in *Discover Bank v. Superior Court*, 113 P.3d 1100 (Cal. 2005), and the Ninth Circuit's decision in *Shroyer v. New Cingular Wireless Services, Inc.*, 498 F.3d 976 (9th Cir. 2007).

Mem. at 1:15-19.

In *Shroyer*, decided last August, the Ninth Circuit found unconscionable a different version of an AT&T[6] class arbitration waiver, *Shroyer*, 498 F.3d at 978.  AT&T argues, however, "*Discover* did not impose an across-the-board ban on class-arbitration waivers in consumer contracts, and *Shroyer* invalidated an earlier—and materially different—version of the arbitration provision at issue in this case."  Mem. at 1:19-22.  AT&T claims through "unprecedented" enhancements to its earlier class arbitration waiver, including revising the filing fee provisions, adding the Premium and the Attorney Premium, and waiving its right to costs and fees, it has addressed *Discover Bank*'s and *Shroyer*'s concern that "when the potential for individual gain is small, very few plaintiffs, if any,

---

[5]  Title 9 U.S.C. § 3 states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

In addition, 9 U.S.C. § 4 states:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

[6]  AT&T is an affiliate of New Cingular Wireless Services, Inc., which was created by the merger of AT&T Wireless Services, Inc. and Cingular Wireless, LLC.  *Shroyer*, 498 F.3d at 979; Docket No. 45 at 1 n.1 (Pls.' Opp'n to Defs.' Mot. ("Opp'n")); Mem. at 12:9-12.  In this Order, New Cingular Wireless Services, Inc. is referred to as AT&T.

will pursue individual arbitration or litigation, which greatly reduces the aggregate liability a company faces when it has exacted small sums from millions of consumers."  Mem. at 1:22-2:2 (quoting *Shroyer*, 498 F.3d at 986 (citing *Discover Bank*, 113 P.3d at 1106-10)).

In a related argument, AT&T argues the FAA preempts any application of California's unconscionability law to the Arbitration Agreement, because while "the FAA permits courts to refuse to enforce arbitration agreements based on *generally applicable* state [contract] law principles. . . .  it would require a marked deviation from those principles to invalidate" AT&T's enhanced Agreement.  Mem. at 2:4-9.  "To call this provision 'unconscionable' notwithstanding the incentives it provides to customers and their lawyers would be to drain the concept of 'unconscionability' of all meaning."  *Id.* at 2:15-17.  Thus, in AT&T's view, because its class arbitration wavier is allegedly "conscionable," were the Court to strike it down as unconscionable, it would not be applying generally applicable state contract law, but merely using that as cover to covertly strike down a class arbitration waiver, *solely because it is a class arbitration waiver*, in violation of the FAA.

As discussed below, however, for the reasons stated by the Ninth Circuit in *Shroyer*, the Court finds the class arbitration waiver of the Arbitration Agreement operates as an exculpatory clause, and is thus unconscionable, and thus unenforceable.  Likewise, under *Shroyer*, the Court finds the FAA does not preempt invalidating the class arbitration waiver on this ground.  The Court thus denies AT&T's motion to compel arbitration.

## ANALYSIS

### I.      Subject-Matter Jurisdiction

The Court has class-diversity subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A), which states:

The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--(A) any member of a class of plaintiffs is a citizen of a State different from any defendant . . . .

28 U.S.C. § 1332(d)(2).

It is undisputed the damages at issue here, roughly $117 in allegedly hidden fees, for at least 500,000 iPhone consumers, the putative class members, would exceed $5,000,000. Further, it is undisputed iPhone consumers are found throughout the United States. Thus, the Court has class-diversity subject-matter jurisdiction.

## II.     AT&T's class arbitration waiver is unconscionable.

Despite its purported enhancements, analyzing AT&T's class arbitration waiver under *Shroyer*, the Court finds it unconscionable.[7]

### A.     *Shroyer v. New Cingular Wireless Services, Inc.*

In *Shroyer*, the plaintiff alleged when a cellular telephone services affiliate of AT&T and another wireless entity merged, consumers using the prior AT&T affiliate suffered a deterioration in service. *Shroyer*, 498 F.3d at 979. He also alleged when he complained, the new entity told him and similarly situated consumers to switch their service to the new merged entity, so they could receive a new computer chip, to address the problem. *Id.* To obtain it, however, he and these other consumers had to extend their service contracts with the new entity, at higher rates than they were previously paying. *Id.*

Nonetheless, Shroyer switched his service, and in doing so, bound himself to a contract which included the following language:

> You and [AT&T] agree that YOU AND [AT&T] MAY BRING CLAIMS AGAINST
>
> THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, and not as a
>
> plaintiff or class member in any purported class or representative proceeding.

---

[7]     The Court declines to consider *Preston v. Ferrer*, __ U.S. ___, No. 06-1463, 2008 WL 440670, 2008 U.S. LEXIS 2011 (Feb. 20, 2008), submitted to the Court, by AT&T, on February 21, 2008, under Civil Local Rule 7-3 [Docket No. 50], because the decision is not settled law until the 25-day period for filing a motion for rehearing has expired. *See* U.S. R. 44. Further, while *Preston* concerns the FAA, it does not address unconscionability, so its application here is questionable. Likewise, the Court notes but declines to apply to this matter, *Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213 (9th Cir. 2008), submitted by the Stieners, on February 22, 2008, under Civil Local Rule 7-3(d), because it does not involve an arbitration agreement with terms similar to the Premium or Attorney Premium, and it actually appears to have terms somewhat more onerous than those in the Arbitration Agreement before the Court. *See Lowden*, 512 F.3d at 1215-16. Further, although the Ninth Circuit did strike down T-Mobile's class arbitration waiver, it did so in a fairly straightforward manner, under Washington common law, citing as necessary to its detailed analysis in *Shroyer*, but did not add anything new to this area of the law.

> Further, you agree that the arbitrator may not consolidate proceedings of more than
> one person's claims, and may not otherwise preside over any form of representative
> or class proceeding, and that if this specific proviso is found to be unenforceable,
> then the entirety of this arbitration clause shall be null and void.

*Id.* at 979-80.

Shroyer then filed a class action against AT&T claiming various causes of action, including breach of contract, breach of the covenant of good faith and fair dealing, fraud and deceit under section 1710 of the California Civil Code, and unfair competition under section 17200 of the California Business and Professions Code. *Id.* at 979. AT&T removed the action to federal court and filed a motion to compel arbitration under the FAA. *Id.* at 980. AT&T claimed the class arbitration waiver was conscionable, and alternatively, the FAA preempted any application of California's unconscionability law to the waiver. *Id.* at 980-81. The district court granted the motion. *Id.* at 981.

In reversing, the court noted, "Section 2 of the Federal Arbitration Act provides that arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract.' 9 U.S.C. § 2." *Shroyer*, 498 F.3d at 981 (emphasis added). It also noted, "It is well-established that unconscionability is a generally applicable contract defense, which may render an arbitration provision unenforceable." *Id.* (citing *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir.2006) (en banc) (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996))).

The court further noted, under California law, a contract provision is unconscionable only if it is *both* procedurally *and* substantively unconscionable, but as California employed a sliding scale, the greater presence of one would allow for the lesser presence of the other, and still support a court finding a provision unconscionable. *Shroyer*, 498 F.3d at 981-982.

The court then noted, in 2003, it had twice held class arbitration waivers in contracts of adhesion were procedurally and substantively unconscionable. *Id.* at 982 (discussing *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1176 (9th Cir. 2003) (employment contract); *Ting v. AT&T*, 319 F.3d 1126, 1150 (9th Cir. 2003) (telephone services contract)). It also said, in *Ingle* and *Ting*, it had

9

relied heavily upon *Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 118 Cal.Rptr.2d 862 (2002), which found procedural unconscionability in the adhesive nature of a credit card services contract, and substantive unconscionability in the imposition of a one-sided and oppressive class action waiver provision. *Shroyer*, 498 F.3d at 976.

The Ninth Circuit then noted the California Supreme Court had approved *Szetela*'s reasoning, in 2005, when it held a class arbitration waiver unconscionable, in *Discover Bank v. Superior Court. Id.* at 982. In *Discover Bank*, the "plaintiff alleged that the company had misrepresented the date by which it needed to receive consumers' payments in order to avoid charging late payment fees." *Id.*

The California Supreme Court first stated:

> the [unconscionability] doctrine has both a procedural and a substantive element, the
> former focusing on oppression or surprise due to unequal bargaining power, the latter
> on overly harsh or one-sided results. The procedural element of an unconscionable
> contract generally takes the form of a contract of adhesion, which, imposed and
> drafted by the party of superior bargaining strength, relegates to the subscribing party
> only the opportunity to adhere to the contract or reject it. Substantively
> unconscionable terms may take various forms, but may generally be described as
> unfairly one-sided.

*Id.* at 982 (quoting *Discover Bank*, 36 Cal. 4th at 160).

This court then held while class action waivers were not per se unconscionable, the FAA would not bar them from finding that:

> when the waiver is found in a consumer contract of adhesion in a setting in which
> disputes between the contracting parties predictably involve small amounts of
> damages, and when it is alleged that the party with the superior bargaining power has
> carried out a scheme to deliberately cheat large numbers of consumers out of
> individually small sums of money, then, at least to the extent the obligation at issue is
> governed by California law, the waiver becomes in practice the exemption of the
> party "from responsibility for [its] own fraud, or willful injury to the person or

///

property of another." (Civ. Code, § 1668.) Under these circumstances, such waivers

are unconscionable under California law and should not be enforced.

*Shroyer*, 498 F.3d at 983, 983 n.5 (quoting *Discover Bank*, 36 Cal. 4th at 162).

As a result, the California Supreme Court found the Discover Bank class arbitration waiver unconscionable. *Shroyer*, 498 F.3d at 982. In turn, applying the three *Discover Bank* elements of adhesion, damages, and deception, the Ninth Circuit found Shroyer's class arbitration waiver unconscionable. *Id.* at 981, 983-84. In this case, applying the three *Discover Bank* elements to AT&T's class arbitration waiver demonstrates it too is unconscionable under California law.

**B.     Under *Shroyer's* three-part test, AT&T's class arbitration waiver is unconscionable.**

**1.     AT&T's Arbitration Agreement is a contract of adhesion.**

As *Shroyer* noted, "Under California law, '[a] contract of adhesion is defined as "a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms." ' " *Id.* at 983 (quoting *Nagrampa*, 469 F.3d at 1281 (quoting *Flores v. Transam. HomeFirst, Inc.*, 93 Cal.App.4th 846, 853, 113 Cal.Rptr.2d 376 (2001))). The Ninth Circuit found Shroyer's agreement with AT&T was adhesive where it used its substantially greater bargaining power, to set the terms of the deal, in a take-it-or-leave-it fashion, and did not give Shroyer the opportunity to negotiate. *Id.* at 983-84. Here, AT&T appears to concede, as it should, under the facts presented, the Arbitration Agreement is adhesive under California law. Mem. at 9:5-10:1 (conceding this is its only oppressive aspect, and it only generates a "minimal degree of procedural unconscionability").

**2.     The setting involves a small amount of damages.**

The *Shroyer* court noted in "*Discover Bank*, the plaintiff sought to recover for a $29 fee charged to him for late payments and other finance charges." *Shroyer*, 498 F.3d at 984. After *Discover Bank* was decided, the California Appellate Court held claims for $200 or even for $1,000, were "small amounts of damages" under the second part of the *Discover Bank* test. *Id.* (discussing *Cohen v. DirecTV, Inc.*, 142 Cal.App.4th 1442, 1452, 48 Cal.Rptr.3d 813 (2006) and *Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571, 587, 61 Cal.Rptr.3d 344 (2007), respectively). Thus, in

11

*Shroyer*, the court had little problem finding $69.98 in damages also qualified as a "small amount of damages" for this step of the test. Likewise, here, the Stieners' claim for $114.95 qualifies as a "small amount of damages" for purposes of the second part of the *Discover Bank* test.

### 3. The Stieners allege a scheme of deliberate cheating.

In *Shroyer*, the Ninth Circuit found plaintiff's complaint plainly alleged AT&T had used its superior bargaining power to carry out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money. *Shroyer*, 498 F.3d at 984. Specifically, Shroyer alleged to increase profits, the merged entity deliberately induced thousands of pre-merger AT&T customers to enter into new agreements by misrepresenting their services would be improved only if they extended their contract terms. *Id.* "The gravamen of Shroyer's complaint is [the merged entity] undertook a fraudulent scheme, and, in fact, one of his causes of action is for fraud and deceit." *Id.* Nonetheless, the *Shroyer* court noted California courts do not require a cause of action or express allegation of fraud, as long as the allegations would support finding it occurred. *Id.*

Here, however, the Stieners did plead fraudulent concealment. And, they alleged AT&T and Apple deliberately induced hundreds of thousands, if not millions, of consumers to purchase iPhones for $499 to $599, while intentionally hiding the fact they would be subject to annual battery-replacement and related charges equal to around $115, or 19% to 23% of their purchase price. Rather clearly, AT&T used its superior bargaining power to carry out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money.

### 4. Conclusion

In *Shroyer*, the Ninth Circuit found "Because all three parts of the *Discover Bank* test are satisfied, AT&T's class arbitration waiver is both procedurally and substantively unconscionable, and cannot be enforced."[8] *Id.* For the same reasons, the Court finds here that AT&T's class

---

[8] In so holding, the Ninth Circuit noted its conclusion was similar to that reached by district judges in the Northern, Central and Southern Districts of California in at least ten other cases. *See Bradberry v. T-Mobile USA, Inc.*, No. 06-6567, 2007 WL 1241936, 2007 U.S. Dist. LEXIS 34826 (N.D. Cal. Apr. 27, 2007) (Wilken, J.); *Winig v. Cingular Wireless*, LLC, 06-4297, 2006 WL 2766007, 2006 U.S. Dist. LEXIS 73137 (N.D. Cal. Sept. 27, 2006) (Chesney, J.); *Hoffman v. Cingular Wireless, LLC*, No. 06-1021, 2006 U.S. Dist. LEXIS 79067 (S.D. Cal. Oct. 26, 2006) (Whelan, J.); *Page v. Verisign, Inc.*, No. 06-0906 (S.D. Cal. Aug. 3, 2006) (Miller, J.); *Herrington v. Verisign, Inc.*, No.1915 (S.D. Cal. Aug. 3, 2006) (Miller, J.); *Stern v. Cingular Wireless Corp.*, 453

arbitration waiver in its Arbitration Agreement is both procedurally and substantively

unconscionable, and cannot be enforced.

**C.      Under *Shroyer* and other cases, AT&T's two counter-arguments fail.**

AT&T raises two counter-arguments to finding the class arbitration waiver in its Arbitration

Agreement is unconscionable, neither of which is availing.

**1.      The Stieners demonstrate *more* than a minimal showing of procedural**

**unconscionability.**

In *Discover Bank*, the California Supreme Court held procedural unconscionability focuses

"on oppression or surprise due to unequal bargaining power."  *Shroyer*, 498 F.3d at 982 (quoting

*Discover Bank*, 36 Cal.4th at 160).  AT&T makes three arguments alleging the Stieners have failed

to show an appreciable amount of oppression or surprise, and thus, under California's sliding scale

test, they must make a "strong showing" of substantive unconscionability, which it argues they fail

to do, in a subsequent portion of its Points and Authorities.  Mem. at 11:17-24.  As the following

discussion shows, however, AT&T's counter-arguments fail.

**a.      The lack of market alternatives for the iPhone demonstrates**

**additional procedural unconscionability.**

AT&T first argues an adhesive contract, like its Terms of Service, by itself, without any

other evidence, merely demonstrates a "minimal degree of procedural unconscionability," citing to

*Gatton*, 152 Cal.App.4th at 585.  Mem. at 9:4-11.  AT&T is partially correct, but did not provide the

full quote.  *Gatton* held, the "use of a contract of adhesion establishes a minimal degree of

procedural unconscionability *notwithstanding the availability of market alternatives*."  *Gatton*, 152

Cal.App.4th at 355-56 (emphasis added).  Thus, where there are *no market alternatives*, the use of

an adhesive  contract will establish a greater degree of procedural unconscionability.

Here, AT&T disingenuously argues an iPhone is merely a cell phone, ubiquitous in the

F.Supp.2d 1138 (C.D. Cal.2006) (Snyder, J.); *Janda v. T-Mobile, USA, Inc.*, No. 05-3729, 2006 WL
708936, 2006 U.S. Dist. LEXIS 15748 (N.D. Cal. Mar. 17, 2006) (White, J.); *Ford v. Verisign, Inc.*,
No. 05-0819, 2006 U.S. Dist. LEXIS 88856 (Mar. 8, 2006) (Miller, J.) (discussing the court's
December 19, 2005 order); *Cervantes v. Pacific Bell Wireless*, No. 05-1469, 2006 U.S. Dist. LEXIS
89198 (S.D. Cal. Mar. 8, 2006) (Miller, J.) (discussing the court's January 10, 2006 order); *Laster v.
T-Mobile USA, Inc.*, 407 F.Supp.2d 1181 (S.D. Cal.2005) (Sabraw, J.).

wireless communications marketplace.  Mem. at 10:1-3.  As Apple's marketing materials make clear, however, an iPhone "combines three amazing products—a mobile phone, a widescreen iPod and a *breakthrough Internet device*—into one small, lightweight, handheld device with desktop-class email, web browsing, searching and Google Maps."  Docket No. 39, Ex. "4" at 1, col. 1, para. 1 (emphasis added) ("AT&T Plans for iPhone" pamphlet).  Not only is the *breakthrough* iPhone apparently unique among wireless products, and thus without market alternatives, the Stieners purchased two when they were *first* available for purchase.[9]  Thus, even were there market alternatives available now, though the Court has no evidence to suggest this, it appears there were none when the Stieners purchased theirs.  Thus, on the iPhone's uniqueness alone, the Stieners clearly have shown an additional amount of procedural unconscionability.

> **b.** **The iPhone need not be a necessity for the Stieners to show additional oppression**.

AT&T's second argument is the Stieners cannot show any additional procedural unconscionability by oppression, because a cell phone is not a necessity.  Mem. at 10:1-8.  The argument is moot, as the *breakthrough* iPhone's uniqueness already suffices to show oppression beyond the minimal established by AT&T's adhesive contract.

Nonetheless, the Court also notes the three cases on which AT&T bases its argument, *see* Mem. at 10:3-8, do not appear to hold a showing of necessity is critical to a showing additional oppression, in cases involving adhesive contracts.  In the first case cited, *Belton v. Comcast Cable Holdings, LLC*, 151 Cal.App.4th 1224, 60 Cal.Rptr.3d 631 (2007), the court's unconscionability analysis did not turn so much on "necessity," as it did on market alternatives.  The court noted FM music was available to the legally blind plaintiff from free sources he possessed and used, like the radio, and thus he need not purchase Comcast's cable television to get it.  *Id.* at 1229, 1246.  Further, *Belton* was issued on June 8, 2007, prior to *Shroyer*'s issuance on August 17, 2007, so the former does not affect this Court's reliance on the latter's holding.

Likewise, AT&T's second case, *Provencher v Dell, Inc.*, 409 F.Supp.2d 1196 was issued in

---

[9]      It seems unlikely Apple would have sold 270,000 iPhones in the first 30 hours of release, were it easily fungible with other mere cell phones.

2006, well before the Ninth Circuit's decision in *Shroyer*.  In addition, the Court is reluctant to adopt the district court's analysis from *Provencher* for two reasons.  First, Provencher admitted he was fully aware of the arbitration provision at issue, before he even made his purchase, *id.* at 1198-99, which as discussed *infra* in part II.C.1.c, is not the case here.  Second, the court determined whether there was "a small amount of damages" not by considering the plaintiff's lone claim of about $1,850, but by multiplying this amount by a possible class of 500,000 members, to find the result was not "a small amount of damages."  *Id.* at 1202, 1202 n.7.

Lastly, AT&T's third case, *Riensche v. Cingular Wireless LLC*, No. C06-1325Z, slip op., 2007 WL 3407137 (W.D. Wash. Nov. 09, 2007), issued by a court inferior to the Ninth Circuit, only held phone service was not a necessity for purposes of analyzing whether the plaintiff had purchased it under compulsion or duress.  *Id.* at *8.  It did not consider unconscionability.  Regardless of these cases' holdings, however, the fact an iPhone may not be a necessity does not bar the Stieners from showing more than minimal procedural unconscionability, here.

### c. The Stieners were surprised.

AT&T's third argument is the Stieners cannot show any "surprise," given the typefaces used in the Terms of Services Agreement to notify them of the Arbitration Agreement, and the holding in *Gatton*.  Mem. at 10:9-11:16.  In *Gatton*, plaintiffs purchased handsets from T-Mobile, which came in boxes which were "sealed across the closing seam with a sticker that stated:  'IMPORTANT  [¶] Read the enclosed T-Mobile Terms & Conditions.  By using T-Mobile service, you agree to be bound by the Terms & Conditions, including the *mandatory arbitration* and early termination fee provisions.' "  *Gatton*, 152 Cal.App.4th at 575-76 (emphasis added).

In this case, in contrast, AT&T concedes at the time of an iPhone purchase, in a store, all a consumer receives is a pamphlet [Docket No. 39, Ex. "1"] and a fact sheet [Docket No. 39, Ex. "2"].  Berinhout Decl. ¶ 7.  AT&T does not claim these documents, totaling three pages, contain any information regarding the Arbitration Agreement, and the Court found none.  AT&T does claim a Terms of Services booklet [Docket No. 39, Ex. "3"], is available in a store which sells iPhones, but neither claims it is given to a consumer at purchase, *nor explains the failure to provide one*.  Berinhout Decl. ¶ 8.

*///*

AT&T spends a fair amount of effort explaining how the Stieners could not have been surprised, due to the disclosures provided during the activation process, and the fact they had to click on a box next to the statement, "I have read and agree to the AT&T Service Agreement." Mem. at 10:22-11:16; Berinhout Decl. ¶ 9. AT&T is thus arguing there is no surprise where the Stieners first received notice of the Arbitration Agreement, *after* they spent $1,200 plus tax on their iPhones, took them home, then presumably out of their containers, and connected them to their computer, not to review a lengthy legal document, but merely to activate them. *Gatton* does not support this argument.[10] Thus, the Stieners were surprised.

### 2. AT&T's class arbitration waiver is substantively unconscionable as an exculpatory clause.

AT&T's second counter-argument is its "unprecedented" revised Arbitration Agreement prevents the class arbitration waiver from being substantively unconscionable, as AT&T's revisions were designed to address the defects in its prior class arbitration waiver, invalidated by the Ninth Circuit, in *Shroyer*. Mem. at 11:27-14:5. Examining the Premium and the Attorney Premium, however, and comparing how AT&T's Arbitration Agreement and a class action would allow iPhone users to dispute the $114.95 in battery-changing and related charges, shows AT&T's class

---

[10]     The Stieners make a number of allegations regarding the activation process, including that the typefaces and the positioning used in the Terms of Service booklet are not duplicated on the iTunes web site used for activation. Opp'n at 5:24-6:12. As a result, the Stieners claim the critical arbitration waivers are not bolded but are buried in with other text, in a lengthy legal document. *Id.* The Stieners did not verify their complaint nor attach a declaration or relevant exhibits to it. Thus, the Court is unable to consider these unsworn statements in reaching its holding.

        Further, both the Stieners and AT&T direct the Court to www.youtube.com to view videos regarding the activation process. *Id.* at 5:19-20; Docket No. 48 at 3 n.3 (Def.'s Reply Mem. of P. & A. in Supp. of Mot. ("Reply")). The Court reminds the parties they are responsible for providing the Court any evidence they wish it to consider. The Court declines the parties' invitation to go beyond the filed pleadings and exhibits.

        Lastly, AT&T tries to ameliorate the lack of notice to the Stieners by noting they could have returned their iPhones for a 90% refund. Reply at 3:7-11 (noting 10% restocking charge); Docket No. 39, Ex. "2," last para. AT&T, however, does not explain how this addresses "surprise," nor explain why consumers who decline to activate to preserve their legal right to a jury trial should pay a 10% fee. Apple indicates its stores will waive the restocking charge for customers who reject AT&T's Terms of Service, though no mention is made of AT&T's stores. Docket No. 55, Ex. "A" ¶¶ 2, 6. Not only is it unknown where the Stieners purchased their iPhones, Apple does not indicate how the Stieners would have known about this waiver policy, which the Court notes, would not have addressed their surprise.

arbitration waiver operates as an exculpatory clause, in violation of *Shroyer*.

### a. The Ninth Circuit's invalidation of AT&T's prior class arbitration waiver, in *Shroyer*.

In *Shroyer*, AT&T argued its then existing class arbitration waiver was:

not substantively unconscionable because, unlike the waiver in *Discover Bank*, it does not operate to "insulate a party from liability that otherwise would be imposed under California law," or exempt [AT&T] "from responsibility for [its] own fraud, or willful injury to the person or property of another."

*Shroyer*, 498 F.3d at 986 (quoting *Discover Bank*, 36 Cal.4th at 161).

AT&T claimed this was so, because (1) it paid the full cost of arbitration, unless the petitioner filed a frivolous claim as determined under the standards of Rule 11(b), and (2) if the petitioner recovered an award equal to or greater than their demand, then they received attorney's fees. *Shroyer*, 398 F.3d at 986. As a result, AT&T alleged its arbitration clause did not deter customers from arbitrating individual small-value claims and did not insulate itself from liability. *Id.*

The Ninth Circuit rejected this reasoning, holding:

[AT&T's] attempt to distinguish *Discover Bank* based on the availability of attorneys' fees and arbitration costs is without merit. The California Supreme Court in *Discover Bank* rejected "the rationale . . . that the potential availability of attorney fees to the prevailing party in arbitration or litigation ameliorates the problem posed by such class action waivers." 36 Cal.4th at 162, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (citations omitted). As the court reasoned, "[t]here is no indication . . . that, in the case of small individual recovery, attorney fees are an adequate substitute for the class action or arbitration mechanism." *Id.* This rationale applies with equal force to arbitration costs, which are almost always far less than attorneys' fees.

*Shroyer*, 498 F.3d at 986 (footnote omitted).

The Court continued:

Contrary to [AT&T's] contention, the court was concerned that when the potential for

17

individual gain is small, very few plaintiffs, if any, will pursue individual arbitration

or litigation, which greatly reduces the aggregate liability a company faces when it

has exacted small sums from millions of consumers.  *See id.* at 158-62, 30

Cal.Rptr.3d 76, 113 P.3d 1100.  It did not suggest that a waiver is unconscionable

only when or because a plaintiff in arbitration may experience a net loss (including

attorneys' fees and costs).

*Shroyer*, 498 F.3d at 976.

The Ninth Circuit concluded, because AT&T "has failed to distinguish its class arbitration

waiver from the waiver in *Discover Bank*, we hold that the former is unconscionable and

unenforceable under California law." *Id.*

> **b.**     **AT&T's new class arbitration waiver insulates it from liability,**
> **and thus does not survive a *Shroyer* analysis.**

In order for AT&T's new class arbitration waiver to survive an analysis under *Shroyer*, it

must address the Ninth Circuit's concern that "when the potential for individual gain is small, very

few plaintiffs, if any, will pursue individual arbitration or litigation, which greatly reduces the

aggregate liability a company faces when it has exacted small sums from millions of consumers."  In

other words, it needs to show its Arbitration Agreement functions as well as a class action would,

such that it has not insulated itself from hundred of thousands, if not millions, of iPhone users

seeking recovery of the hidden  $114.95 in annual battery-changing and related charges.

Towards this end, AT&T argues, "In light of the opportunities for 'individual gain' that are

built into [AT&T's] arbitration provision," "[AT&T] has not immunized itself from liability

because" there are "inducements for customers to pursue their claims in arbitration and for lawyers

to represent" them.  Mem. at 13:16-14:1.  Further, it alleges it has an inducement to settle quickly

before arbitration, or risk paying thousands of dollars in Premium and Attorney Premium.  *Id.*

at 14:1-5.  Lastly, it claims by allegedly reducing the cost to file an individual claim, it has created a

"market for fair settlement."  *Id.* at 14:11-13.  AT&T thus concludes its class arbitration waiver

cannot operate as an exculpatory clause shielding it from liability.  *Id.* at 14:7.  Examining the

parties' arguments regarding the Premium, the Attorney Premium, and the "market for fair

settlement," however, it appears AT&T's class arbitration waiver greatly reduces the aggregate liability it otherwise would face due to exacting "small sums from millions of consumers."

          **i.**         **The Premium is an insufficient inducement for individuals to sue, such that the class arbitration waiver operates to immunize AT&T from liability from claims suitable for class action.**

The most challenging problem facing AT&T, in demonstrating its Arbitration Agreement is a fair substitute for a class action, is proving that hundreds of thousands, if not millions, of AT&T consumers across the country have the time, resources, or inclination to individually dispute the $114.95 in annual charges. Towards this end, AT&T claims the Premium and the Attorney Premium would induce them to do so.

In response, the Stieners argue this " 'incentive' argument ignores the critical fact that these incentives are entirely illusory: they evaporate entirely if AT&T offers the plaintiff a 'settlement payment' equal to his or her loss. Where the amount in dispute is predictably small, . . . the incentives no longer apply," and the $114.95 case remains a $114.95 case. Opp'n at 9:21-10:6.

AT&T counters:

> Plaintiffs' beef, in short, is that [AT&T's] provision makes satisfaction of an individual consumer's claim too likely—i.e., that customers will not be motivated to pursue disputes against [AT&T] if those claims are almost certain to be met with offers of payment in full. That argument makes no sense: Customers will be more likely—not less—to make the minimal effort required to submit a notice of dispute form in light of the incentives [AT&T] has to provide them with "'settlement payment[s]' equal to [their] loss."

Reply at 6:18-24.

AT&T has not only failed to respond to the Stieners' argument, it has supported it. AT&T argues consumers would be more likely to make "the *minimal* effort required" to dispute the $114.95

in charges, even if their "claims are *almost certain* to be met with offers of payment in full."[11]  The

Stieners, however, persuasively argue that AT&T need not settle in full with all or most plaintiffs,

but need only do so with a *certain percentage* of plaintiffs, denying them the Premium.  At some

percentage point, other AT&T consumers, who have not yet sought arbitration, would believe the

only likely *potential* recovery available through arbitration would be the $114.95, but not the

Premium.  *Without the Premium as an inducement to arbitrate, these consumers would only make*

*the allegedly minimal effort to arbitrate, if they had the time, resources, or inclination to seek the*

*$114.95, by itself.*  AT&T's key-stone argument in this matter, however, is the Court should not

invalidate its class arbitration waiver under *Shroyer*, because the Premium would induce consumers

to arbitrate disputes over small amounts of damages.  The Stieners argue persuasively, however, that

as a practical matter the Premium is illusory.

AT&T has two additional counter-arguments to the Stieners.  First, AT&T claims the

Premium exceeds statutory damage awards of $1,000 or less, set by various state or federal statues,

such as the Fair Credit Reporting Act, 15 U.S.C. § 1681n, or the California Disabled Persons Act,

section 54.3(a) of the California Civil Code.  Mem. at 13:2-8.[12]  The Stieners do not respond to this

specific argument.  The Court merely notes these statutes appear designed for actions brought by

individuals or a class, but do not appear designed to supplant the latter, which is AT&T's goal here:

to demonstrate how its Arbitration Agreement may effectively obviate the need for a class action, a

question to which these statutes do not speak.

AT&T's second argument is its Premium provides a higher recovery than "the typical

incentive payments awarded to class representatives as part of court-approved class settlement

agreements."  Mem. at 13:8-15 (citing Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards*

*to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1333 & tbl. 5 (2006)

(median incentive award in consumer and consumer credit cases is $2,089 and $1,045, respectively).

---

[11]     Were AT&T to "almost certainly" settle in full each demand for the $114.95 in charges, then arguably it should simply reimburse all AT&T consumers the $114.95 in charges, whether they requested reimbursement or not, a result the Stieners seek here via class action.

[12]     Of course, the Court notes, this is substantially less than the California Unruh Act's statutory damages of $25,000 for civil rights violations.  *See* Cal. Civ. Code § 52(b)(2).

Again, the Stieners do not specifically address this argument.  The Court merely notes the operative comparison here is between how the Arbitration Agreement and a class action might resolve a dispute between all iPhone consumers and AT&T.  In this regard, AT&T has not presented any evidence that *all* iPhone consumers would recover more, on average, if the Court let the Arbitration Agreement stand rather than allowing the Stieners' class action to proceed.  Thus, having considered the parties' arguments regarding the Premium, it appears an insufficient inducement for individuals to pursue arbitration or a small claims action, such that AT&T's class arbitration waiver operates to immunize it from liability from claims amendable to class action.[13]

## ii. *Shroyer* and *Discover Bank* rejected adjustments to the attorneys' fees provisions of class arbitration waivers, as a means of addressing unconscionability.

The Attorney Premium does little to nothing to induce any attorney to take on a $114.95 dispute.  Quite simply, it is unclear that such a case would generate significant fees, as it would ostensibly take few billable hours to work up.  Moreover, given that many plaintiffs lawyers work on contingency, they would more likely focus their efforts on cases with a higher potential recovery.  AT&T appears to concede this by noting, "under [AT&T's] arbitration provision, most customers will likely be able to recover most or all the amount in dispute *without incurring any attorneys' fees at all . . . .*"  Reply at 7:3-4 (emphasis in original).

The Attorney Premium is also likely to do little or nothing to induce any attorney to get involved, because the entire Premium structure appears illusory, for the reasons discussed *supra* in part II.C.2.b.i.  Possibly anticipating this problem, AT&T argues, "customers who are aided by counsel in pursuing their disputes are likely to receive *settlement offers* that include reasonable

_____

[13]     AT&T attempts to provide some statistics indicating the Arbitration Agreement works:  In September 2007, its customer service personnel provided $119 million in manual credits, and in some unspecified prior 12-month period, they provided $1 billion in manual credits.  Berinhout Decl. ¶ 16.  Between January 1 and October 31, 2007, AT&T received over 500 notices of dispute, *id.* ¶ 20, and in 2005 and 2006, it was sued "about 850" times in small claims court nationwide, *id.* ¶ 21.  Unfortunately, AT&T provides no meaningful context in which the Court can assess these figures for any useful purpose.  Thus, the Court can only guess if these figures are high or low, or if they indicate consumers are pleased with AT&T, or ignorant of their rights and remedies, or somehow frustrated in vindicating them.

attorneys' fees." *Id.* at 7:7-8 (emphasis added). In support of this statement, AT&T *does not point to the Attorney Premium*, but instead claims that *prior to a notice of arbitration*, AT&T "generally responds . . . with a written settlement offer[,]" that "include[s] a reasonable amount of attorneys fees . . . whenever a customer represented by counsel has included a request for attorneys' fees . . . ." Docket No. 49 ¶¶ 2, 4 (Reply Decl. of Neal S. Berinhout in Supp. of Def.'s Mot.). AT&T notably fails to indicate, however, how many customers are represented by counsel, or what the terms "generally" or "reasonable amount" mean.

As an additional argument, AT&T claims customers who sue under fee-shifting statutes, like the Stieners, may claim attorneys' fees, as the Arbitration Agreement allows prevailing parties to seek fees under prevailing law, as long as they do not exceed the Attorney Premium. *See* Reply at 7 n.5. Problematically for AT&T, this argument fails, as the Stieners did not sue under a fee-shifting statute. They sued under California's Unfair Competition Act, section 17200 *et seq.* of the California Business and Professions Code, which does not provide for attorneys' fees. Under California law, attorney's fees are available only by contract, statute, or law. Cal. Code Civ. Proc. § 1033.5(a)(10). As the Arbitration Agreement does not provide for attorneys' fees, only that a party may seek them under applicable law, it is unclear what contract, statute, or law would provide fees to the Stieners were the Attorney Premium unavailable to them.

Thus, it is unclear the Attorney Premium or the attorneys' fees provisions of AT&T's Arbitration Agreement would significantly increase the amount of attorney participation in tiny claims arbitrated against AT&T. As a result, the agreement is not an effective substitute for a class action. As the California Supreme Court has noted, what drives and makes class actions effective is the legal representation available, no doubt driven by the potential for *lucrative compensation*. Thus it held in *Discover Bank*, "in the case of small individual recovery, attorney fees are [not] an adequate substitute for the class action or arbitration mechanism." Thus, the Attorney Premium in AT&T's Arbitration Agreement waiver does not mitigate the exculpatory nature of the class action

waiver.[14]

///

///

        **iii.**      **It is not clear that the Arbitration Agreement creates a fair market for settlement, which would operate as efficiently as a class action would.**

In order for AT&T to prevail, it must demonstrate it is more efficient for hundreds of thousands, if not millions, of iPhone users to individually dispute the $114.95 in charges, through arbitration or small claims courts, rather than in one class action.[15] AT&T claims the Arbitration Agreement reduces the costs of bringing an individual claim, such that a market for fair settlement is created.[16] Mem. at 14:11-13. The Stieners argue a class action is more efficient for the courts, consumers, and benefits competition and society as a whole, by discouraging unfair and fraudulent conduct by allowing its redress in one action, rather than in millions of individual actions. Opp'n at 10:10-14. AT&T counters the Arbitration Agreement reduces the cost of disputes, which will lead to lower prices for AT&T's goods and services. Reply at 8:15-24. AT&T also argues that by exchanging their right to proceed as a class, its consumers make a fair tradeoff. *Id.* at 8:10-15. The Stieners question AT&T's ability to make a fair exchange here, as AT&T is unlikely to file a class action against its own consumers. *See id.* at 11:11-25 (discussing *Ting*). Considering the parties' arguments, AT&T has failed to establish its Arbitration Agreement is as efficient a dispute

---

[14]     This analysis also applies to AT&T's provision in the Arbitration Agreement not to seek costs and fees. *See Shroyer*, 498 F.3d at 986 ("[A] waiver is [not] unconscionable only when or because a plaintiff in arbitration may experience a net loss (including attorneys' fees and costs).").

[15]     The Arbitration Agreement allows AT&T to seek a global settlement with every arbitrating iPhone consumer, but *only if each and every one of them agrees to do so*. Docket No. 39, Ex. "3" at 15 ¶ 6 (TOS booklet). Ignoring for the moment that this strategy would fail to cover non-arbitrating iPhone consumers, this "single veto" provision makes the Arbitration Agreement less efficient than a class action.

[16]     The Court expresses some concern that rather than establishing a "fair market," the Premium appears to insert a Monte Carlo type aspect into the arbitration process, in that consumers are being wooed by the promise of a bonus for taking a chance on arbitration, rather than taking no action at all, or rather than suing in small claims court.

resolution mechanism as class actions are.[17]

///

AT&T's Associate General Counsel does state:

> Many disputes between [AT&T] and its customers are resolved by means of a call or e-mail to [AT&T's] customer care department, which is known at [AT&T] as the Office of the President, making it unnecessary for the customer to file a Notice of Dispute. I have instructed personnel in the Office of the President to contact the legal department (and me in particular) whenever they become aware of a pattern of similar complaints so that I can review the complaints and determine whether any changes to [AT&T's] practices are necessary.

Berinhout Decl. ¶ 15.[18]

AT&T has provided insufficient evidence for the Court to find this adequately substitutes for providing its consumers with a right of class action. Thus, in reviewing the arguments on this issue, the Court is not convinced the Arbitration Agreement creates a fair market for settlement, which would operate as efficiently as a class action would.

### c.      Conclusion

Examining the parties' arguments regarding the Premium, the Attorney Premium, and the "market for fair settlement," AT&T's class arbitration waiver appears to operate as an exculpatory clause, greatly reducing the aggregate liability it otherwise would face due to exacting "small sums from millions of consumers." As such, the Arbitration Agreement does not operate as efficiently as a class action would to address iPhone users' disputes over the $114.95 in charges. Thus, under *Shroyer*, the class arbitration waiver is substantively unconscionable.

---

[17]      The Court notes its unconscionability analysis here is not focused on the members of some putative class, but only on the Stieners, whether as named plaintiffs or nameless members of a class action. Thus, while the Court might discuss the efficiency of the Arbitration Agreement, versus that of a class action, in societal terms, its ultimate concern is whether it is unconscionable to deprive the Stieners of the right to bring the force of the arguably more efficient class action to bear on AT&T, to vindicate their rights, as well as the rights of all other iPhone users, regarding the $114.95 in charges.

[18]      AT&T does not explain why it refers to its "customer care department" as the "Office of the President."

### 3.     Conclusion

Under California's sliding scale, the Stieners have shown an adhesive contract, a lack of market alternatives, and surprise, demonstrating procedural unconscionability.  Likewise, they have shown substantive unconscionability by showing AT&T's class arbitration waiver operates as an exculpatory clause.  Thus, under *Shroyer*, the class arbitration waiver is unconscionable.

///

### 4.     As goes the class arbitration waiver, so goes the Arbitration Agreement.

AT&T's class arbitration waiver provides, "If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void."  Docket No. 39, Ex. "3" at 15 ¶ (6) (TOS booklet).  As the Court stated in *Shroyer*:

> Because [AT&T] has failed to distinguish its class arbitration waiver from the
> waiver in *Discover Bank*, we hold that the former is unconscionable and
> unenforceable under California law.  In addition, because the class arbitration waiver
> is unenforceable, we must also hold that the entire arbitration clause is void.

*Shroyer*, 498 F.3d at 986.

For the same reasons, the Court finds AT&T's class arbitration waiver unconscionable and unenforceable under California law, rendering its Arbitration Agreement void.[19]

## III.     The FAA does not preempt the application of California's unconscionability law to AT&T's class arbitration waiver.

AT&T argues the FAA preempts the application of California's unconscionability law to its class arbitration waiver.  Mem. at part III.  The purpose of the FAA is to enforce arbitration agreements, "save upon such grounds as exist at law or in equity for the revocation of any contract."  As 9 U.S.C. § 2 states:

> A written provision in any maritime transaction or a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy thereafter arising out of

---

[19]     Having voided the Arbitration Agreement in its entirety, the Court has no need to address the Stieners one-sentence argument that in the event their claims at law are preempted, their injunctive claims are not arbitrable in California.  *See* Opp'n at 16:21-23.

such contract or transaction, or the refusal to perform the whole or any part thereof,

or an agreement in writing to submit to arbitration an existing controversy arising out

of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable,

*save upon such grounds as exist at law or in equity for the revocation of any contract.*

9 U.S.C. § 2 (emphasis added).

///

In *Shroyer*, the Ninth Circuit found the FAA did not preempt applying California's unconscionability law to arbitration agreements. *Shroyer*, 498 F.3d at 987. In so holding, the court engaged in a detailed analysis demonstrating conclusively that California's unconscionability law is "a generally applicable contract defense" at law, and not a state law which specifically targets arbitration agreements. *Id.* at 981, 987-88. In this regard, the Ninth Circuit specifically concluded that allowing unconscionable arbitration provisions to stand would not further the FAA's purpose of fostering arbitration. *Id.* at 988-93. As AT&T correctly notes, the Court is bound by *Shroyer*. Mem. at 15:11-12.

AT&T does advance one argument in favor of preemption, to which the Court now turns. AT&T argues because its class arbitration waiver is conscionable, any attempt by the Court to invalidate it on the grounds of unconscionability would, in substance, amount to a covert act to invalidate it *solely* because it is part of an arbitration agreement. Mem. at 15:15-17:16. That improperly stretching the definition of "unconscionability" to reach its class arbitration waiver would *not* be applying it as a *generally* applicable contract defense, in violation of the FAA. *Id.*

AT&T's reasoning is flawed for two reasons. First, in part II, *supra*, the Court provided a detailed analysis as to why AT&T's class arbitration waiver is unconscionable. Thus, AT&T's assumption that its class arbitration waiver is conscionable, is incorrect, mooting its argument. Second, as discussed in part II, *supra*, the Court did not invalidate the class arbitration waiver because it was part of an arbitration agreement. The Court invalidated it because under California's

generally applicable unconscionability law, the waiver operated in an unconscionable manner.[20]

/// 

/// 

**CONCLUSION**

Accordingly:

(1)     Defendant AT&T Mobility, LLC's Motion to Compel Arbitration and to Dismiss Claims Pursuant to the Federal Arbitration Act [Docket No. 38] is DENIED;

(2)     The Court's order [Docket No. 44] granting AT&T Mobility, LLC's Motion to Stay Its Obligations under the Court's Initial Scheduling Order Pending Resolution of Its Soon-To-Be-Filed Motion to Compel Arbitration [Docket No. 33] is VACATED; and

(3)     The deadlines set by the Court's Order Setting Initial Case Management Conference and ADR Deadlines [Docket No. 2] are RESET as follows:

| Date | Event | Governing Rule |
|------|-------|----------------|
| 03/27/2008 | Last day to: | |
| | ● meet and confer re: initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP_26(f) & ADR L.R.3-5 |
| | ● file Joint ADR Certification with Stipulation to ADR Process or Notice of Need for ADR Phone Conference | Civil_L.R. 16-8 |
| 04/03/2008 | Last day to file Rule 26(f) Report, complete initial disclosures or state objection in Rule 26(f) Report and file Case Management Statement per attached Standing Order re Contents of Joint Case Management Statement (also available at http://www.cand.uscourts.gov) | FRCivP 26(a) (1) Civil _L.R . 16-9 |
| 04/24/2008 | **INITIAL CASE MANAGEMENT CONFERENCE at 2:45 p.m.** The parties shall **meet and confer** prior to | Civil _L.R. 16-10 |

---

[20]     AT&T also asserted a second argument, buried in a dense, 26-line, single-spaced footnote, for the "purposes of preserving this issue for possible Supreme Court review." Mem. at 9 n.6. If AT&T truly wished to place this issue squarely before the Court, it should have fully briefed it in the body of its Points and Authorities. Failing to do so does not preserve a "throw away" argument for review as it has not been placed before this Court. Given that AT&T relegated this point to a footnote which arguably circumvents the local rule page limits, it has in essence acknowledged this issue is irrelevant for purposes of this motion. Because AT&T did not consider the issue sufficiently meritorious or pertinent to invest any time in developing it, the Court invests none of its time in addressing it.

the conference and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten (10) days prior to the Case Management Conference that complies with the Standing Order for all Judges of The Northern District of California and the Standing Order of this Court.  Plaintiff(s) shall be responsible for filing the statement as well as for arranging the conference call.  All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.

IT IS SO ORDERED.


March 12, 2008

_Saundra B Armstrong_
Saundra Brown Armstrong
United States District Judge